IN RE THE MATTER OF THE COMPLAINT OF
MARQUETTE TRANSPORTATION COMPANY
OFFSHORE, LLC, AS OWNER AND OPERATOR
OF THE M/V MISS BECKY, FOR EXONERATION
FROM OR LIMITATION OF LIABILITY

MARQUETTE TRANSPORTATION                            **PETITIONER**
COMPANY OFFSHORE, LLC

v.

ABEL CISNEROS                                         **CLAIMANTS**

AND

GREAT LAKES DREDGE &
DOCK COMPANY, LLC

## MEMORANDUM OPINION AN ORDER

This matter is before the Court upon a motion by Petitioner Marquette Transportation Company Offshore, LLC ("Marquette") against Claimant Abel Cisneros ("Cisneros"). [DN 84]. Claimant Cisneros has responded, [DN 87], and Marquette has filed its reply [DN 91]. Fully briefed, Marquette's motion is ripe for review, and for the following reasons, it is **GRANTED.**

### Background

Abel Cisneros was employed by Marquette at all times relevant to this case. [DN 84-1 at 4]. In November 2015, Cisneros was set to begin work on the tug boat M/V MISS KATIE.[1] *Id.* During his hitch on the MISS KATIE, Cisneros would be working on a Great Lakes dredging project near Sandy Hook, New Jersey. [DN 87 at 1]. The MISS KATIE's role on the dredging project was to

---

[1] The M/V MISS KATIE has since been re-named the M/V MISS BECKY. [DN 84-1 at 2].

assist by moving scows[2] after the Great Lakes' dredges had filled them with dredge materials. [DN 84-1 at 5]. The dredges and scows used in the project were owned and operated by Great Lakes. *Id.*

On November 3, 2015, Cisneros arrived at a dock in Atlantic Highland, New Jersey, where he boarded a crewboat named the M/V NS-IV. [DN 84-1 at 4]. Great Lakes supplied the NS-IV to transport employees out to the dredging project. [DN 84-2 at 2]. The NS-IV was scheduled to transport Cisneros to the MISS KATIE. [DN 84-1 at 4]. The NS-IV was operated by Great Lakes employees. *Id.* Cisneros claims that he injured his back while boarding the NS-IV ("The First Incident"). [DN 87 at 3]. More specifically, Cisneros claims that he felt a "pop" in his back while handing his bag to the captain of the NS-IV. *Id.* The captain of the NS-IV, a great lakes employee, had instructed Cisneros to hand his bag over. [DN 87 at 1]. Although it is disputed, it appears that Cisneros's bag—which Cisneros packed—weighed between forty and sixty pounds. [DN 84-1 at 4; DN 87-1 at 6]. No other Marquette employees were present when Cisneros boarded the NS-IV. [DN 84-1 at 4]. Cisneros did not report his alleged injury until the next day. *Id.* at 4-5.

Cisneros testified that after handing his bag to the captain of the NS-IV, he boarded the crewboat using a ladder. [DN 87-2 at 47-48]. The captain of the MISS KATIE, Charles Cannon, boarded the NS-IV earlier that day from the same dock.[3] [DN 87 at 2]. Captain Cannon testified that he boarded the NS-IV using stairs that Great Lakes provided for him. [DN 91 at 9].

The next day, after boarding the MISS KATIE, Cisneros boarded a Great Lakes scow to untie it from the dredge. [DN 84-1 at 5]. Cisneros was the only Marquette employee on the scow. *Id.*

---

[2] The parties use the terms "scow" and "barge" interchangeably.
[3] It is not entirely clear whether Captain Cannon boarded the NS-IV earlier the same day or on the prior day. But it is immaterial whether Cannon boarded the NS-IV on the same day, or the day before. The Court will assume without deciding that Captain Cannon boarded the NS-IV on the same day as Cisneros.

Cisneros claims that he felt a bump or jerk while working on the scow that caused him to injure his back ("The Second Incident"). [DN 84-1 at 5]. More specifically, Cisneros claims that either the MISS KATIE or the Great Lakes dredge struck the scow thereby causing the bump or jerk. *Id.* The only evidence of the bump on the record is Cisneros's testimony. *Id.* Cisneros testified that he does not know which vessel struck the scow. *Id.*

After he finished untying the scow from the dredge, Cisneros returned to the MISS KATIE and—for the first time—reported to Captain Cannon that he had felt a pop in his back the day before when handing his bag to the captain of the NS-IV. [DN 84-4 at 34-37]. Cisneros told Captain Cannon that he had woken up on the day of the Second Incident with significant back pain but decided to try to work through it. *Id.* Cisneros reported to Captain Cannon that as the day went on his pack pain continued and therefore he decided to stop working. *Id.* Cisneros did not report a bump to Captain Cannon. *Id.* Cisneros was then transferred off the MISS KATIE. *Id.*

Cisneros filed suit in March 2017 against Marquette and Great Lakes in Harris County, Texas. [DN 84-1 at 6]. Marquette then filed a complaint for Exoneration from or Limitation of Liability on March 30, 2017 in the United States District Court for the Eastern District of Louisiana, and the litigation in Harris County, Texas was stayed. *Id.* Cisneros filed an Answer and Claim in the limitation action [DN 27, as amended by DN 62-2], alleging both that Marquette was negligent and that it failed to provide a seaworthy vessel. On consent motion, the limitation action was transferred to the United States District Court for the Southern District of Texas by Order dated April 17, 2017. [DN 12]. Finally, the matter was transferred to the Western District of Kentucky by Order dated July 17, 2017. [DN 34]. Cisneros claims that it was the unseaworthiness of the MISS KATIE and/or the negligence of Marquette that caused him—at least in part—to injure his back.

## Legal Standard

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 556 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestle USA, Inc.*, 694 F. 3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251-52).

As the party moving for summary judgment, Marquette must shoulder the burden of showing the absence of a genuine dispute of material fact, as to at least one essential element of each of Cisneros's claims. Fed. R. Civ. P. 56(c); *see Laster*, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). If Marquette satisfies its burden of production, Cisneros "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324).

**Discussion**

## I. Unseaworthiness.

Often compared to strict liability or no-fault claims, seaworthiness stems from a shipowner's "absolute duty to maintain a seaworthy ship, the breach of which imposes liability without fault." *Perkins v. Am. Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 602 (6th Cir. 2001) (citing *Brown v. Dravo Corp.*, 258 F. 2d 704, 706 (3d Cir. 1958)). To prevail, a plaintiff must show that the vessel upon which he was injured was unseaworthy, and that the vessel's unseaworthy condition was the proximate cause of his injuries. *Churchwell v. Bluegrass Marine, Inc.*, 444 F.3d 898, 904 (6th Cir. 2006). "A vessel is unseaworthy if the vessel and its appurtenances are not 'reasonably fit for their intended use.'" *Id.* (quoting *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550, 80 S. Ct. 926, 4 L. Ed. 2d 941 (1960)). An unseaworthy condition "proximately causes an injury if it played a substantial part in bringing about or actually causing the injury and the injury was either a direct result of a reasonably probable consequence of unseaworthiness." *Id.* (internal quotation marks and citations omitted). However, a vessel is not required to be "free from all possibility of mishap, for the seaworthiness of a ship is a relative concept, dependent in each instance upon circumstances." *Perkins*, 246 F.3d at 602. "Generally, unseaworthiness is a question of fact for the jury and should not be resolved by the district court as a matter of law." *Churchwell*, 444 F.3d at 904.

### a. First Incident.

Ordinarily, a defendant is only liable under a theory of unseaworthiness if they are the owner, operator, or owner *pro hac vice* of the vessel upon which the plaintiff's injury occurred. *Guidry v. Continental Oil Co.*, 640 F.2d 523, 530 (5th Cir. 1981) (citing *Stokes v. B.T. Oilfield Services, Inc.*, 617 F.2d 1205, 1207 (5th Cir. 1980)); *Householder v. American Commercial Barge*

5

*Lines*, 1999 A.M.C. 982, 985 (W.D. Ky 1998) ("Therefore, it is clear that an unseaworthiness claim can only be brought against an owner of a vessel.").

Marquette has informed the Court that there is no genuine dispute of material fact regarding whether it owned or operated the NS-IV. In fact, Marquette informed the Court that no Marquette employees other than Cisneros were present when the first incident allegedly occurred. [DN 84-2]. Marquette identifies Cisneros's Amended Claim [DN 62-2 at 5] as evidence of the absence of genuine dispute. In his Amended Complaint, Cisneros alleges that "Mr. Cisneros was taken to his vessel by a Great Lakes vessel. As part of this process, the captain of the Great Lakes vessel ordered that Mr. Cisneros lift his luggage onto the Great Lakes vessel. This lift injured Plaintiff's back. . . ." *Id.*

Because Marquette has cited to specific evidence on the record indicating that there is an absence of dispute of material fact regarding Cisneros's unseaworthiness claim, Cisneros "may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. Caresource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)). Cisneros has not offered evidence—such as affidavits, depositions, or answers to interrogatories—to counter Marquette's well supported motion for summary judgment on this issue. Therefore, Marquette is entitled to summary judgment on this issue, and is exonerated from liability to Cisneros for the First Incident under a theory of unseaworthiness.

Cisneros argues that the unseaworthiness of the Miss Katie was the proximate cause of his injuries because "Mr. Cisneros was instructed to board a vessel that did not have a gangway, and therefore required Mr. Cisneros to violate Marquette's manual lifting policy and the gangway

policy." [DN 87 at 11]. Furthermore, Cisneros argues that Miss Katie's captain (Captain Cannon) was aware that there was no gangway to board the NS-IV and "[h]ad Mr. Cannon been properly trained, he would have easily noted the safety violation and reported or fixed it." *Id.* In other words, Cisneros alleges that Miss Katie's crew—specifically Captain Cannon—was not reasonably fit for its intended purpose because Captain Cannon did not ensure that a gangway was available for Cisneros to board the NS-IV.

Captain Cannon did have personal knowledge of the workplace conditions at the dock because he had boarded the NS-IV earlier that day and admits in his deposition that a gangway was not provided.[4] [DN 87 at 2]. However, Cisneros has failed to identify a genuine dispute of fact for two reasons. First, it is undisputed from the record that it was the captain of the NS-IV who instructed Cisneros on how to board the vessel and that no other Marquette employees were present when Cisneros boarded the NS-IV. [DN 84-2].

Second, although it is true that Captain Cannon was aware of the conditions of the dock, Cannon explains in his deposition that stairs were available as a safe alternative for boarding the vessel. [DN 91-1 at 9-10]. Instead of offering evidence to dispute Captain Cannon's explanation that a safe means of boarding the NS-IV was available, Cisneros completely ignores the existence of the stairs in his response. Cisneros does not mention the stairs in his response, much less offer an explanation supported by evidence why they are not a safe alternative to a gangway. Rather, Cisneros relies on Marquette's policy requiring a gangway as evidence that the condition of boarding the NS-IV was unsafe. The relevant policy states:

---

[4] Although Cannon testified that there was no "gangway per se" on the dock, he also testified that he considered the stairs that were available to be a gangway. [DN 87-3 at 7].

4.1 Access to vessels afloat. The company shall not permit employees to board or leave any vessel, except a barge or river towboat, until the following requirements have been met:

4.1.1 Whenever practicable, a gangway of not less than 20 inches walking surface of adequate strength, maintained in safe repair and safely secured shall be used. If a gangway is not practicable, a substantial straight ladder, extending at least 36 inches above the upper landing surface and adequately secured against shifting or slipping shall be provided. When conditions are such that neither a gangway or a straight ladder can be used, a Jacob's ladder meeting the requirement of paragraphs (d)(1) and (2) of this section may be used.

[DN 91 at 8].

Cisneros's reliance on the text of this policy is insufficient to survive summary judgment. In his deposition, Captain Cannon explained that the stairs provided for boarding the NS-IV were a safe and practical alternative to a gangway due to the dimensions of the dock. [DN 87-3 at 13]. Cisneros does not offer evidence to counter Cannon's characterization of the stairs. The fact of the stairs' existence is absent from Cisneros's response.[5] Cisneros's unseaworthiness theory of liability requires Marquette to be on notice of the alleged unsafe conditions of the dock used to board the NS-IV. But Cisneros does not argue in his response that Cannon was incorrect when he explained that the available stairs were a safe alternative for boarding the NS-IV.

Cisneros attached his own Declaration [DN 87-6] to his response. In this Declaration, Cisneros says that "When I was on the dock on November 3, 2015, there was no set up steps present used to board the vessel."[6] *Id.* It is immaterial, however, to Cisneros's claim whether the stairs were present during his boarding for two reasons. First, because Marquette does not own or

---

[5] In an exhibit attached to his response, Cisneros declares that there were not stairs available to him when he boarded the NS-IV. However, as the Court explains below, this does not create a genuine dispute of fact. Furthermore, Cisneros does not reference this part of the exhibit in his response.

[6] Cisneros does not cite to this portion of the record in his response to argue that the stairs were unavailable when he boarded the NS-IV. Cisneros does not mention the stairs in his response. "The nonmoving party has the burden of directing the Court's attention to specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Rutherford v. Lake Michigan Contractors, Inc.*, 28 Fed.Appx. 395, 399-400 (6th Cir. 2002).

operate the NS-IV or the dock where Cisneros boarded the crew boat, Marquette may only be liable if the crew of the MISS KATIE had actual or constructive notice of the alleged unsafe boarding conditions. Second, it is undisputed from the record that Marquette had no such notice because Captain Cannon testified that a set of stairs was provided to him, that—although there was not a "gangway per se"—he considered the stairs to be a gangway, that the stairs were a safe alternative to a gangway, and because Cisneros does not refute any of Cannon's testimony about the steps in his response. Further, Cisneros explained in his deposition that the captain of the NS-IV provided him with a ladder to board the vessel. [DN 87-2 at 47-48]. Marquette's boarding policy permits the use of ladders. Therefore, it appears from the record that Cisneros's method of boarding the NS-IV was compliant with Marquette's safety policy.

Cisneros's Declaration [DN 87-6]—filed after Marquette's motion for summary judgment—directly contradicts his deposition testimony and therefore cannot create a genuine dispute of material fact. A "party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). "A directly contradictory affidavit should be stricken unless the party opposing the summary judgment provides a persuasive justification for the contradiction." *Id.* And "[a]lthough the nonmoving party is entitled to all reasonable inferences when evaluating a summary judgment motion, when a plaintiff's claims are only supported by his 'own contradictory and incomplete testimony . . . no reasonable person would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." *Bush c. Compass Group USA, Inc.*, 683 Fed.Appx. 440, 448-449 (6th Cir. 2017) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005)). During the deposition of Cisneros, the following exchange took place:

| Q: | All right. And how did you get into the crew boat |
| | -- |
| A: | The ladder. |
| Q: | -- with that gap? |
| A: | The ladder. |
| Q: | Okay. Where was the ladder? Describe it for me. |
| A: | On the side of the – of the stern. |
| Q: | Is it – |
| A: | On the corner. |
| Q: | Is it a fixed ladder on the crew boat that you climb up? |
| A: | He – he put it there. The captain of the crew boat put it there. |
| Q: | Right. |
| A: | It just hooks on, has two hooks on it, and he just drops it down and hooks it there. |
| Q: | All right. And then you climb up the boat? |
| A: | Yes, Ma'am. |

[DN 87-2 at 47-48]. In his Declaration, however, Cisneros says "When I was asked to board the NS4 on November 3, 2015, there was no gangway, straight ladder, or other devise present to assist me in boarding the vessel." The Declaration is directly contradictory to Cisneros's earlier sworn testimony. Therefore, this Court can "properly decline to consider the contradictory statements in the [Declaration]." *Bush*, 683 Fed.Appx. at 448.

Cisneros's claim is that the Miss Katie was unseaworthy because her crew was not sufficiently trained to report or correct a boarding procedure that was not compliant with Marquette's safety policy. Marquette's safety policy permits the use of a ladder to board vessels. Cisneros's sworn testimony is that he boarded the NS-IV using a ladder provided by the crew boat's captain. Cisneros does not argue that Marquette's safety policy is insufficient, and in fact his argument is predicated on his belief that the policy was not adhered to. More importantly, there

is no genuine dispute of fact regarding whether Captain Cannon—or any other member of MISS KATIE's crew—had notice of any unsafe conditions because it is undisputed that the stairs were available when Cannon boarded the NS-IV.

Marquette did not own the NS-IV or the dock where Cisneros's injury allegedly occurred. Furthermore, Marquette did not have actual or constructive notice of an unsafe boarding procedure for two reasons. First, Captain Cannon, who boarded the NS-IV earlier that day, found the conditions to be safe and in compliance with Marquette safety policies. Second, Cisneros's testimony is that he boarded the NS-IV using a ladder, a boarding method permitted by Marquette's safety policy. And Cisneros does not dispute whether Marquette's boarding policy, if followed, is a safe boarding policy. There is no reason for this Court to believe that any inspection by an agent of Marquette would result in an evaluation of the boarding conditions that is different from that of Captain Cannon. Although unseaworthiness generally is a question of fact for the jury and should not be resolved by the district court as a matter of law, in this case no reasonable jury could find Marquette liable under a theory of unseaworthiness for the injuries that Cisneros allegedly suffered while boarding the NS-IV. *See Churchwell*, 444 F.3d at 904. Therefore, Marquette is entitled to summary judgment on this issue, and is exonerated from liability to Cisneros for the First Incident under a theory of unseaworthiness.

### b. Second Incident.

Cisneros argues that the MISS KATIE was unseaworthy because her crew failed to warn him of the bump or jerk that allegedly occurred during the Second Incident. "Unseaworthiness extends not only to the vessel but to the crew." *Waldron v. Moore—McCormack Lines, Inc.*, 386 U.S. 724, 727, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967). In other words, Cisneros claims that the MISS KATIE was not reasonably fit for her intended use due to defects in her crew and that her

unseaworthiness was the proximate cause of Cisneros's alleged injuries. *See Churchwell*, 444 F.3d at 904.

A party moving for summary judgment may satisfy its initial burden either by presenting affirmative evidence that negates an element of the non-moving party's claim or by identifying "an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325. With respect to Cisneros's claim arising out of the Second Incident, Marquette identifies that there is an absence of evidence regarding whether the MISS KATIE was responsible for causing the alleged bump or jerk and whether the bump or jerk occurred in a manner which would allow the crew of the MISS KATIE time to give a "watch the bump" warning. Because Cisneros has failed to come forward with specific facts demonstrating that there is a genuine dispute for trial on this issue, Marquette is entitled to summary judgment and is exonerated from liability.

In response to Marquette's assertion that he has failed to demonstrate that it was the MISS KATIE who caused the bump, Cisneros advances several arguments. First, Cisneros argues—without citing to specific facts on the record—that the dredge was "spudded down" when the bump occurred.[7] [DN 87 at 9]. Cisneros claims that if the dredge was "spudded down" and was probably tied to the scow, then it is unlikely that the dredge caused the bump or jerk. Therefore, Cisneros argues, it is more likely that the MISS KATIE cause the bump. And Cisneros claims that if it was the MISS KATIE that struck the barge, then "whomever was captaining the Miss Katie would have knowledge of and an opportunity to warn Mr. Cisneros of the 'bump' before it occurred pursuant to Marquette's safety policy." *Id.*

---

[7] This means that a dredge is secured or tied-down to the river-bed or ocean floor.

The argument that the dredge was "spudded down" requires the Court to speculate which vessel made contact with the scow and whether the contact was made in a manner that allowed the crew of the MISS KATIE an opportunity to warn Cisneros. Cisneros has not cited evidence from which the Court can draw the inference that the MISS KATIE is responsible for the bump or that her crew had time to warn Cisneros. Without this evidence, the Court may only speculate on the circumstances of the Second Incident. While it is true that the Court must draw all reasonable inferences from the facts in favor of Cisneros, it would be unreasonable to infer from the evidence on record that the MISS KATIE caused the bump or that the bump occurred in a manner allowing time for a warning. The evidence cited by Cisneros is not probative enough to justify such inferences.[8]

Cisneros fails to cite specific evidence on the record to support his claim that the dredge was spudded down. [*See* DN 87 at 9]. "The nonmoving party has the burden of directing the Court's attention to specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Rutherford v. Lake Michigan Contractors, Inc.*, 28 Fed.Appx. 395, 399-400 (6th Cir. 2002) (citing *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001)). Cisneros has not satisfied his burden of directing the Court to evidence on the record that the dredge was spudded down when the bump occurred and therefore his argument does not create a genuine dispute of fact.

Cisneros's reliance on the opinion of Bob Borison's expert report also fails to establish a genuine dispute of fact. Cisneros cites Borison's expert report for the proposition that the MISS

---

[8] It is also noteworthy that Cisneros does not mention a bump or jerk in the injury/illness report he filed with Marquette following the Second Incident. [DN 87-5].

KATIE's crew had a duty to warn Cisneros of the bump but failed to do so. [DN 87 at 9]. Borison's opinion regarding the bump is as follows:

> In my opinion, based on my education, training, and experience that either, the captain of the **M/V MISS KATIE,** or one of the dredge operators, should have warned Mr. Abel Cisneros of the impeding bump between the two vessels: the scow and the **M/V MISS KATIE** or scow and the dredge. The unexpected bump that Mr. Abel Cisneros experienced while working, stooped down, further exacerbated his MSD.

[DN 87-7 at 6 (emphasis in original)]. Assuming without deciding that Borison's expert report is admissible,[9] it does not create a genuine dispute of material fact for two reasons. First, Borison's opinion is that *either* the captain of the MISS KATIE *or* one of the dredge operators should have warned Cisneros. Borison's opinion is only evidence that Cisneros should have been warned of the bump; It does not serve as evidence that the responsibility for failing to warn Cisneros ultimately fell on the crew of the MISS KATIE. Second, Borison formulated his opinion without knowledge of which vessel made contact with the scow, where the point of contact was, or how the contact occurred. In fact, Borison testified that he does not know where any point of contact occurred or whether the dredge or MISS KATIE hit the scow. [DN84-8]. Borison's opinion is based on the deposition testimony of Cisneros, Wendell Neal, and Captain Cannon. Cisneros testified that the scow moved, but that "I don't know if Miss Katie moved a little bit from the scow, and when it tried to position back into place, it hit it, or the barge – I mean, the dredge moved it, hit it, because they're a little – they're probably a couple – about four or five feet separate from the dredge." [DN 87-7 at 15]. Cisneros, therefore, testified that either vessel could have caused the bump. Captain Cannon testified that "To have a bump occur that would cause somebody to lose their footing. I would have to run into that scow at a pretty good click." [DN 87-7 at 16]. Cannon's

---

[9] Marquette has filed a motion in limine challenging the admissibility of Borison's opinion on this issue.

testimony—viewed in light of the evidence that the MISS KATIE was moored to the scow—suggests that it is unlikely the MISS KATIE could have generated enough force to cause the bump. Neal testified that, although he did not feel the bump, "everyone that's involved in an operation that bumps are a potential, you know, you supposed to – you know, try to look out for a – if you see – everybody that sees a bump should try to notify – holler and look for the – watch for the bump." [DN 87-7 at 17]. While Neal's testimony supports Cisneros's claim that Marquette has a policy that encourages—or arguably requires—employees to warn others of bumps, it does not provide any clarity to the issue of whether the bump in this case was caused by the MISS KATIE or occurred in a manner that her crew could have warned Cisneros.

Without further evidence regarding how the alleged bump occurred, Borison's opinion on who should have warned Cisneros does not create a genuine dispute of material fact. Even if Borison's expert evidence is admissible—and the Court is assuming without deciding that it is— the Court may still grant summary judgment where that evidence amounts to no more than a scintilla. *See Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 362 (6th Cir. 2011) (citing *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 750 n. 21 (3d Cir. 1994)). "Although juries are generally free to believe expert witnesses, a plaintiff cannot survive summary judgment with an expert's bare opinion on the ultimate issue." *Id.* at 363. "[A]n expert opinion must 'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation." *Brainard v. American Skandia Life Assur. Corp.*, 432 F.3d 655, 663-664 (6th Cir. 2005) (quoting *Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1579-80 (11th Cir. 1985)). "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Mid-State Fertilizer Co. v. Exch. Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989) (citing *Richardson v. Richardson-Merrell, Inc.*, 857 F.2d 823, 829-32 (D.C. Cir. 1988)). Borison's opinion does not outline a line of reasoning

arising from a logical foundation regarding who had a duty to warn Cisneros of the bump. Instead, Borison relies on speculation and inconclusive testimony. For these reasons, Borison's expert report does not create a genuine dispute of fact.

Not only has Cisneros failed to cite to evidence on the record to support his theory that the MISS KATIE was responsible for the bump, but the following facts weigh against drawing an inference that the MISS KATIE was responsible for, or could have warned of, the bump that allegedly injured Cisneros's back. First, Cisneros testified during his deposition that the MISS KATIE was moored to the barge and stayed in that position while he was working to untie the line on the scow. [DN 87-2 at 33]. This evidence undermines Cisneros's theory that, because the dredge was tied to the scow, it is more likely that the MISS KATIE is responsible for the bump. Second, Wendell Neal[10] testified that he has never—in his nearly twenty-year career working offshore— felt a bump while he was on a scow. In his deposition, Neal explains that he has never felt a bump on a scow because the scows are so big and heavy and "when it's loaded or partially loaded, you're looking at anywhere from 5- to 7,000 cubic yards of sand. That's a lot of weight to shake." [DN 87-1 at 14]. On the other hand, Neal testified that he has experienced bumps that caused him to be thrown across the room while on tug boats, which are significantly smaller and lighter than scows. *Id.* Neal also testified that he was sleeping on the MISS KATIE when the bump allegedly occurred but did not feel a bump. *Id.* at 13-14. Neal's testimony is important because the fact that Neal has never experienced a bump on a scow and that he did not feel the bump Cisneros is complaining of even though Neal was sleeping on the tug boat when it allegedly occurred casts doubt on Cisneros's theory that the MISS KATIE is most likely responsible for the bump.

---

[10] Neal was a deckhand on the Miss Katie during the time of Cisneros's alleged injury.

For Cisneros's claim to survive summary judgment, there must be a genuine dispute of fact regarding whether the MISS KATIE caused the bump or that the bump occurred in a manner allowing her crew to warn Cisneros. Marquette identified an absence of evidence as to each of these facts. Cisneros fails to cite to evidence on the record sufficient to create a genuine dispute of fact, but instead asks the Court to speculate as to which vessel likely caused the bump. Furthermore, there is evidence on the record that weighs against drawing the inference that the MISS KATIE caused the bump. For the foregoing reasons, Marquette is entitled to summary judgment and is exonerated from liability arising out of the Second Incident.

## II. Jones Act Negligence.

The Jones Act embodies a "policy of providing an expansive remedy for seamen who are injured while acting in the course of their employment." *Taylor v. TECO Barge Line, Inc.*, 517 F.3d 372, 382-83 (6th Cir. 2008) (quoting *Rannals v. Diamond Jo Casino*, 265 F.3d 442, 447 (6th Cir. 2001)) (internal quotation marks omitted). In pertinent part, it provides a cause of action in negligence for any seaman injured in the course of his employment. *See* 46 U.S.C. § 30104; *see also Chandris, Inc. v. Latsis*, 515 U.S. 347, 354, 115 S. Ct. 2172, 132 L. Ed. 2d 314 (1995). "Proof of negligence (duty and breach) is essential to recovery under the Jones Act, and an employer's conduct in a Jones Act case is reviewed under the ordinary prudence standard normally applicable in negligence cases." *Rannals*, 265 F.3d at 447 (quoting *Perkins v. Am. Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 598 (6th Cir. 2001)) (internal quotation marks omitted). If the seaman is able to establish that the employer acted negligently, then he need only show that the "employer's negligence 'played any part, even the slightest, in producing the injury or death for which damages are sought.'" *Id.* at 447-48 (quoting *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 506, 77 S. Ct. 443, 1 L. Ed. 2d 493 (1957)). "In order to establish negligence, 'a plaintiff must show that her employer

failed to provide a safe workplace by neglecting to cure or eliminate obvious dangers of which the employer or its agents knew or should have known and that such failure caused the plaintiff's injuries and damages." *Taylor v. TECO Barge Line, Inc.*, 517 F.3d 372, 383 (6th Cir. 2008) (quoting *Rannals v. Diamond Jo Casino*, 265 F.3d 442, 449 (6th Cir. 2001)). It is a fundamental principle that a Jones Act employer "must have notice and the opportunity to correct an unsafe condition before liability will attach." *Perkins*, 246 F.3d 593, 599 (citing *Havens v. F/T Polar Mist*, 996 F.2d 215, 218 (9th Cir. 2001)).

### a. First Incident.

The analysis under this section is similar to the analysis of Cisneros's unseaworthiness claim discussed above because the following facts remain true: (1) Cisneros's sworn testimony is that he boarded the NS-IV using a ladder; (2) Marquette safety policy permits the use of a ladder to board vessels; and (3) Captain Cannon testified that a set of stairs—which he determined to be a safe boarding method—was available to him when he boarded.

The dispositive issue in Cisneros's Jones Act claim arising out of the First Incident is whether there were "obvious dangers" surrounding Cisneros's boarding of the NS-IV of which Marquette had "notice and the opportunity to correct." *Taylor*, 517 F.3d at 383; *Perkins*, 246 F.3d at 599. Marquette has informed the Court that there is no genuine dispute of material fact regarding whether Marquette had notice of any alleged unsafe condition on the dock or NS-IV or the opportunity to correct any such condition. Marquette cites to the record that (1) no Marquette employees were present at the time of the First Incident [DN 84-2]; and (2) Captain Cannon, who boarded the NS-IV earlier that day, believed sufficient means were provided at the dock to board the NS-IV. [Cannon Deposition; DN 84-4 at 3-4].

Because Marquette has satisfied its burden of production, Cisneros "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324). Cisneros cites to several sources of evidence, none of which create a genuine dispute of material fact.

First, Cisneros cites to an expert opinion of Robert Borison. [DN 87-7]. Borison opines that "[Great Lakes] should have provided a gangway, or use of the available stairway, to provide Mr. Abel Cisneros a safe method to carry his heavy offshore bag onto their vessel." *Id.* at 6. This opinion does not create a dispute of fact. First, Borison does not say that an "obvious danger" was present. His opinion is that Cisneros should have been provided a "gangway or use of the available stairway" to board the NS-IV. Borison agrees that a stairway was available and that the use of the stairway would have been an acceptable means of boarding the NS-IV. Therefore, Captain Cannon's testimony that he boarded the NS-IV using the stairs and found the conditions to be safe is actually bolstered—not undermined—by Borison's opinion. Far from evidence of an "obvious danger," Borison's opinion serves as evidence that any inspection conducted by Marquette— including Captain Cannon's observations—would find that safe boarding conditions were present because any inspector would find the "available stairway" which Borison recommends as a safe means of boarding the NS-IV. *Id.*

In formulating his opinion, Borison relied on several regulations and industry standards. "Compliance with industry standard. . . is relevant, if not conclusive, evidence" that a defendant has not acted negligently. *Rutherford v. Lake Michigan Contractors, Inc.*, 28 Fed.Appx. 395 (6th Cir. 2002) (citing *Cherokee Ins. Co. ex rel Weed v. E.W. Blanch Co.*, 66 F.3d 117, 123 (6th Cir. 1995)). The language of Marquette's Safety Plan ("Section 4.1.1") is nearly identical to Part 1918, Subpart C of the Occupational Safety and Health Administration's ("OSHA") Safety and Health

Regulations for Longshoring. [DN 87-7 at 11]. In its regulation, OSHA defines "Gangway" as "any ramp-like or *stair-like* means of access provided to enable personnel to board or leave a vessel, *including accommodation ladders*, gangplanks and brows." *Id.* (emphasis added). Under this definition, the mobile stairs that Captain Cannon used to board the NS-IV and the ladder that Cisneros testified he used would be compliant with Marquette's safety plan. Furthermore, the U.S. Army Corps of Engineers industry standard provides that "[a] *stairway, ladder*, gangway, personnel hoist or other safe means of access shall be provided at personnel points of access with breaks of 19 in (48.2 cm) or more in elevation." *Id.* at 9 (emphasis added). Therefore, the U.S. Army Corps of Engineers industry standards specifically allows for the means that were used both by Captain Cannon and by Cisneros to board the NS-IV. These regulations and industry standards are evidence that the ladder Cisneros testified he used to board the NS-IV and the stairs that Cannon used were reasonably safe means of boarding the NS-IV. Because Cisneros has not cited evidence on the record that he did not use a ladder or that Cannon did not use steps to board the NS-IV, and because Cisneros does not argue that these industry standards are incorrect, Marquette is entitled to summary judgment.

Second, Cisneros cites to Marquette's Health and Safety Plan's section on "Access to Vessels" ("Section 4.1.1"). [DN 87-4]. Cisneros argues that the Safety Plan was not complied with because he argues that there was no gangway to board the NS-IV, and that Marquette knew or should have known that there was no gangway. In relevant part, the Safety Plan says: "Marquette does not permit employees to board any vessel until the following requirements are met . . . Whenever practicable, a gangway . . . shall be used. . . . If a gangway is not practicable, a substantial straight ladder" or a "Jacob's ladder . . . may be used." [DN 91 at 8]. Cisneros testified that he boarded the NS-IV using a ladder. Marquette cites to Captain Cannon's testimony where he says

"[s]o a gangway being 10-foot long would have extended out, blocked the passageway of other people going down the dock. It would have been impractical because it would probably hung over the dock or had to extend way up on the boat." [DN 91 at 9]. Marquette has identified evidence on the record, therefore, that it may have been impractical to use a gangway to board the NS-IV. Cisneros does not argue in his response that Captain Cannon's characterization of the dock is incorrect or that the available stairs were not a safe alternative. In fact, Cisneros fails to mention the stairs in his response. Furthermore, Cisneros does not address his own testimony that he boarded the dock using a ladder.

It also appears possible that the mobile stairs may qualify as a "gangway" under Marquette's Safety Plan. As discussed above, the OSHA regulation governing the boarding of vessels is nearly identical to Marquette's Safety Plan Section 4.1.1 and OSHA defines "gangway" to include "stair-like means of access" and "accommodation ladders." [DN 87-7 at 11]. Under this definition, the stairs that Captain Cannon used to board the NS-IV and the ladder that Cisneros testified he used would be in direct compliance with Marquette's safety plan. Furthermore, Cannon testified that although the steps were not "a gangway per say," he "would consider the steps a gangway." [DN 87-3 at 7]. In any event, the Safety Plan is not evidence of an "obvious danger" because Captain Cannon boarded the crew boat using the available stairs and because Cisneros has failed to cite evidence on the record that the stairs are an unsafe method of boarding the NS-IV. "The nonmoving party has the burden of directing the Court's attention to specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Rutherford*, at 399-400 (citing *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001)). In fact, Cisneros's expert witness opines that the available stairs would have been an acceptable means of boarding the NS-IV.

[Borison Report, 87-7 at 6]. Therefore, there is no genuine dispute of fact regarding whether Marquette had notice of any unsafe boarding condition.

Third, Cisneros cites to evidence on the record that Marquette's Safety Director is ultimately responsible for ensuring a safe workplace. Marquette's Health and Safety Plan provides that "The Safety Director is responsible for ensuring these procedures are implemented on the vessels." [DN 87-4 at 1]. Cisneros also cites to the following exchange during Captain Cannon's deposition:

Q:      And so my question to you is on that work site, who for Marquette was making sure that the safety policy was being followed, and that a gangway was available for the Marquette employees to get from the dock on to the crewboat?

A:      I don't really know. I mean, because I would consider the steps a gangway.

Q:      We can both agree that it was no secret to Marquette that Marquette employees were going to be using the crewboat, right?

A:      Oh, absolutely.

Q:      And its certainly no secret that safety policy requires the gangway, right?

A:      Yes.

Q:      And so would you agree with me that if Marquette is going to be following safety policy, that there should be someone from Marquette that kind of traces how the employees get from shoreside to the tug in a safe manner?

MR. CRANE:          Objection to form.

THE WITNESS:      Yes.

By MR. LEAVITT:

Q:      And so my question to you is whose responsibility was that? Who did that?

A:      I'm not sure. I'm not sure.

Q:      You're with me that it should have been done; you just can't tell me if anybody did it?

A:      I would, I would, well, I being a captain, had I seen something that – I mean, I assume that it was being done already because I had been out on that job site on the crewboat a couple of times already, and I had no problems. So if there would have been something out of place, or that I felt was dangerous, I would have pointed it out.

Q:      Understood.

A:      But I can't answer you as to whose responsibility it was. I just don't know.

Q:      But you agree with me it should have been somebody's responsibility, right?

A:      Yes.

Q:      And the Captain is responsible for what's going on on his boat, right?

A:      Right.

Q:      And some of this is logistical stuff that's occurring off the boat?

A:      Right.

Q:      So that would fall more on shoreside management?

A:      Exactly.

Q:      And so your expectation would be, you know, for a logistical item like this, how people are actually getting to your boat, you would expect someone from Marquette shoreside management to do the logistics of that, and make sure these men had a safe manner of ingress and egress to actually get to your vessel, right?

A:      Uh-uh.

Q:      Right?

A:      Yes. Yes.

Q:      And certainly, you would want somebody from Marquette to make sure that there was not –it was not going to necessarily involve Marquette employees making what was, what would be a necessarily necessary unsafe lift, right?

            MR. CRANE:          Objection to form.

            THE WITNESS:       Yes.

            By MR. LEAVITT:

Q:      That question makes sense to you?

A:      Usually with Great Lakes, we have a pre-job meeting orientation, and all of these things are discussed though.

[DN 87-3 at 7-8]. Cisneros cites the testimony as evidence that Cannon "agreed that someone from Marquette should have made sure the gangway policy was being implemented for Marquette employees, such as Mr. Cisneros, to board the Great Lakes vessel in question." [DN 87 at 7]. This deposition testimony does not create a genuine dispute of fact for two reasons. First, Cannon testifies that he believed the gangway policy had been properly implemented because he

considered the steps to be a gangway. Second, even if the Safety Director had visited the dock on the day Cisneros allegedly was injured, there is no evidence on the record that she would have found unsafe conditions or an "obvious danger" to be present. Instead, the Safety Director would have found the steps—which Captain Cannon considered to be a gangway and which Cisneros's expert opined would have been an acceptable means of entry to the NS-IV—and the ladder—which is permitted by Marquette's Health and Safety Plan and various industry standards and regulations—that Cisneros testified he used to board the NS-IV. Based on the evidence before the Court, Marquette's Safety Director would not have discovered an "obvious danger" if she has inspected the dock on November 3, 2015.

Finally, Cisneros cites to deposition testimony of Captain Cannon and Wendell Neal to argue that Cisneros was forced to violate Marquette's lifting policy because Marquette's boarding policy allegedly was not followed. [DN 87 at 7]. To create a genuine dispute of fact, this deposition testimony must demonstrate that an "obvious danger" was present on the dock or NS-IV that Marquette had notice—actual or constructive—of and an opportunity to correct. *Taylor*, 517 F.3d at 383; *Perkins*, 246 F.3d at 599. Neal and Cannon testified that it is proper to lift with the legs and to not twist, bend, or reach once an object is lifted. [DN 87 at 2]. Neal also testified that he typically uses a "handover" to place his bag into crew boats before he boards them. [DN 87-1 at 8]. Neal testified that there may be possible circumstances where a bag handover may be an improper lifting technique, although he does not have personal knowledge of the conditions of Cisneros's handover. *Id.* at 9.

Cisneros argues that, "had [Marquette's boarding] policy been implemented, Mr. Cisneros would not have had to perform the lift in question. Mr. Cisneros would have either handed his bag across the gangway or walked across the gangway with his bag." [DN 87 at 6]. Cisneros argues

that (1) a gangway would have allowed him to carry his bag across without completing a handover, and (2) that the purpose of the boarding policy is to create "a situation in which Marquette employees can simply walk on or off vessels, and do so without doing unsafe manual lifts, such as the one ordered of Mr. Cisneros." *Id.* But these arguments ignore the fact that Marquette's policy permit seamen to board vessels using a ladder and that Cisneros would be unable to "simply walk on" the NS-IV while carrying his bag when using a ladder. In fact, Cisneros testified that he used a ladder to board the NS-IV. Cisneros's argument that the conditions of the dock forced him to use an unsafe lifting technique is unpersuasive because Marquette's boarding policy—which Cisneros relies on as his primary evidence of negligence and unseaworthiness—provides that ladders may be used to board vessels and because it was impossible for Cisneros to carry his bag onto the NS-IV while using a ladder. Furthermore, Cisneros fails to address whether the available stairs would allow him to carry his bag onto the NS-IV without completing a handover or to utilize a safer lifting technique while handing his bag to someone on the NS-IV. Captain Cannon testified that the stairs allowed him to safely board the NS-IV without performing an unsafe lift. For the foregoing reasons, the testimony of Cannon and Neal cited by Cisneros does not create a genuine dispute of fact because nothing they said demonstrates an "obvious danger" present in the workplace on November 3, 2015. Cisneros's argument that the conditions of the dock on November 3, 2015 forced him to complete an unsafe lift is unpersuasive and insufficient to create a genuine dispute of fact because (1) Cisneros does not address the available stairs in his response and (2) Cisneros does not dispute that Marquette's boarding policy—which permits the use of ladders to board vessels—provides a reasonably safe workplace when properly implemented.

Marquette identified evidence that the available stairs were a safe means of boarding the NS-IV. Cisneros fails to identify evidence that the stairs were unsafe. In fact, Cisneros did not

address the existence of the stairs in his response. Cisneros testified that he boarded the NS-IV using a ladder, a method which is permitted by OSHA, the Army Corps of Engineers' regulations and industry standards, and Marquette's boarding policy. For the foregoing reasons, there is nothing about the condition of the dock or the NS-IV that would put Marquette on notice that Cisneros would be unable to safely board the crew boat. No reasonable jury could find that Marquette failed to exercise ordinary care, and therefore Marquette is entitled to judgment as a matter of law.

### b. Second Incident.

Cisneros's Jones Act claim arising out of the Second Incident fails for the same reasons as his unseaworthiness claim. Cisneros has failed to identify evidence that the MISS KATIE was responsible for causing the alleged bump or jerk or whether the bump occurred in a manner which would allow the crew of the MISS KATIE time to give a "watch the bump" warning. Because Cisneros has not presented any evidence that the bump was foreseeable, there is no genuine dispute of fact regarding whether Marquette had a duty to warn Cisneros. Like his unseaworthiness claim regarding the Second Incident, Cisneros asks the Court to speculate as to which vessel caused the bump and whether the manner in which the bump occurred allowed time for the MISS KATIE's crew to warn him. For this reason, and the reasons discussed in section (I)(b) of this opinion, Marquette is entitled to summary judgment and is exonerated from liability.

### III. Conclusion.

For the foregoing reasons, **IT IS HEREBY ORDERED,** Petitioner Marquette's motion for summary judgment [DN 84] is **GRANTED.** Marquette is exonerated from liability to Abel Cisneros for the claims discussed herein. The claim of Abel Cisneros as amended [DN 27 and 62-

2] against Marquette Transportation Company Offshore, LLC is hereby summarily dismissed as a

matter of law.    The telephonic final pretrial conference set on March 29, 2019 is cancelled and will be held on March 26, 2019 at 11:00 a.m. Central.      Counsel  must call 1-877-848-7030 then give the Access Code 2523122  and #, then when prompted press # again to join the call.
**IT IS SO ORDERED.**

_Thomas B. Russell_

**Thomas B. Russell, Senior Judge**
**United States District Court**

March 22, 2019

cc: Counsel of Record.